THOMAS, Judge.
In 2001, Patricia R. Nelson was employed by Dollar General Corporation at a store located in Brewton. Although Nelson was originally hired as a clerk in the Brewton store, she was promoted to “third key,” assistant manager, and, ultimately, manager. As manager, Nelson was responsible for numerous duties, including opening and closing the store, hiring and scheduling employees, ordering merchandise, stocking shelves, unloading trucks, operating the cash register, and cleaning the store. Nelson’s position required that she check in all merchandise shipped to the store. This duty required Nelson to assist in the unloading of the delivery truck.
On July 30, 2001, Nelson was checking in merchandise and unloading a truck filled with merchandise for her store. She was inside the tractor-trailer, lifting boxes, when she felt pain in her chest. She continued to work because she knew that the truck needed to be unloaded. However, she broke out in a “cold, freaky sweat” and her employees commented that she was “white as a sheet.” Nelson said that she felt faint and that, at the urging of her employees, she went inside the store to the break room to get some water to splash on her face. Once inside the break room, Nelson passed out; apparently, Nelson revived relatively quickly. Although her employees urged her to go home at this point, Nelson remained at work for a while longer. She did leave work early; however, she did not seek medical attention until the following day, July 31, 2001.
Nelson went to the office of her personal physician, Dr. Stanley Barnes, on July 31. Dr. Barnes was not available to see her, so *116 Nelson saw his partner, Dr. Stephen West. Nelson described the incident the day before to Dr. West, stating that she had felt pain in the left part of her chest and in her left arm and that she had broken out in a sweat. Dr. West’s records indicate that her blood pressure at the time of the office visit was 148/82. Nelson had been treated for high blood pressure by Dr. Barnes since November 1999, when her blood pressure was 170/104. Because of his concern over the possibility that Nelson’s pain and sweating might be linked to a cardiac problem, Dr. West referred Nelson to a cardiologist in Montgomery for testing. That testing did not reveal any cardiac abnormalities.
Upon her return visit after the cardiologist appointment, Nelson saw Dr. Barnes on August 17, 2001. Dr. Barnes reported that Nelson was still suffering chest pain at that time. According to Dr. Barnes, because cardiac problems had been ruled out, he diagnosed Nelson with chest-wall pain arising from costochondritis, which can manifest after overexertion or straining. Dr. Barnes injected Nelson with anti-inflammatory medication and told her to avoid lifting anything heavy. He indicated in his deposition that he had recommended that Nelson take off from work for a time but that she had told him that she could not do so because she had to be at work at the store.
On August 25, 2001, Nelson went to work early, at approximately 5:30 a.m., to prepare the stockroom for a specially scheduled delivery truck expected at around 6:00 or 6:30 a.m. Nelson had been off of work the day before. She had scheduled several employees to be in early at work that morning in expectation of the delivery. Because she was still suffering pain from her costochondritis and because Dr. Barnes had advised her not to lift anything heavy for a few weeks, Nelson had come to work planning to run the register while the other employees unloaded the truck; she testified that she did not do any heavy lifting that morning.
At some point, Nelson received a telephone call from the truck driver notifying her that he had been pulled over by the Alabama Department of Transportation and that the delivery would be delayed. Nelson said that she became frustrated at the news because she had scheduled her employees to be in at the early hour and she could only have so many hours on the payroll. Describing the situation, she said “[i]t was just pure stress. I mean, I went my limit.”
Nelson received another telephone call from a customer, at which point she became “thick tongued,” “dumbfounded,” and was unable to communicate on the telephone. Nelson said that it was like she was trying to think but could not. An employee took her to Evergreen Hospital, where she was diagnosed as suffering from a stroke, briefly treated, and then transferred to Sacred Heart Hospital in Pensacola because the doctors believed that a CAT scan revealed an intereranial hemorrhage. Upon her admission and treatment at Sacred Heart, however, it was determined that Nelson had not suffered an intereranial hemorrhage, or a stroke resulting from a burst blood vessel, but instead that she had suffered an “infarct,” a type of stroke that results from the blockage of a blood vessel inside the brain.
Nelson had a history of high blood pressure, having sought treatment for that condition from Dr. Barnes since November 1999. Dr. Barnes explained, in one of his two depositions admitted into evidence at trial, that his treatment of Nelson’s blood pressure with medication had been successful, having reduced her pressure from 170/104 to readings like 160/80, which was her blood pressure on August 17, 2001, and *117 148/82, which was her blood pressure on July 31, 2001. He noted that the cause of high blood pressure is quite often multifac-torial, including such factors as genetics, smoking, and general lifestyle, which would include a person’s diet, stress level, and tolerance of stress. Dr. Barnes noted that Nelson was a smoker, which he said he had discouraged. He also noted that Nelson had reported stress-related problems to him in June 2001, including some family issues and some work-related issues. He noted in his notes that Nelson had reported working 75-80 hours per week, which he felt was too much for her. He said he urged her to cut back her hours and to take a vacation.
In addition to her high blood pressure, Dr. Barnes also treated Nelson for menopause-related health concerns and anxiety, stress, and depression issues. As he explained in one of his depositions:
“She did, in fact, have some complaints from time to time of some anxiety associated with normal life events, and we did put her on some medication. We gave her samples, and — as I say, we can be very, very specific, as we go long, but I gave her samples of medicine out of the office. She is in an age range where hormones, blood pressure, and anxiety can interplay to create depressive symptoms, and in treating the menopausal symptoms and the blood pressure, sometimes you also in addition treat the anxiety or the depressive symptoms.
[[Image here]]
“Ms. Nelson is a person who is — she did indicate on many occasions where she had problems at home, problems with relationships, problems with work, problems with relatives, in-laws, that type of thing, and, yet, they all boil down to the same diagnosis of hypertension, anxiety, menopausal symptoms.”
Dr. Barnes testified that stress and pain can affect a person’s blood pressure. In his opinion, the stress from work on the date of the stroke and the continued pain Nelson suffered because of her costochon-dritis combined to increase Nelson’s blood pressure on that date. He testified that, in his opinion, the stress, the pain, and the aggravated blood pressure played a role in Nelson’s stroke on August 25, 2001.
Dr. George Dmytrenko, the neurologist who treated Nelson at Sacred Heart Hospital, also testified by deposition. He testified that his medical history for Nelson, part of which his notes reflect was relayed by Nelson’s mother, Eunice Jackson, revealed that Nelson had suffered an inability to speak coherently both on August 25 and on August 24, 2001. Dr. Dmytrenko’s records indicate that Nelson was transferred to Sacred Heart from Evergreen Hospital based on concern that she had intercranial bleeding. Dr. Dmytrenko testified that Nelson had no intercranial bleeding, however, and that she had suffered what is called an “infarct,” which denotes a cerebral vascular incident without bleeding. This type of stroke, according to Dr. Dmytrenko, is known as
“a bland infarct. A small blood vessel somehow got blocked off, just like your old galvanized water pipes in your 1890s Victorian home, all of a sudden the water doesn’t run, is because there’s too much crud on the inside of the pipe, and that’s the kind of stroke that she ultimately had, and that stroke is due to lifestyle, smoking, and hypertension.”
When asked what role high blood pressure plays in strokes, Dr. Dmytrenko explained:
“As I mentioned earlier hypertension is one of a number of constitutional maladies that can predispose patients to having a stroke. These are things that are usually present and prevalent for *118 years, that have not occurred just overnight, and that have either been not properly cared for or not cared for at all for long periods of time. We’re not talking days and weeks, and in particularly, because of the kind of pathology in her case where the blood vessel somehow for — we don’t know what reason became blocked off, our best guess is that those blood vessels had, quote, hardening of the arteries, atherosclerotic disease, and that hardening of the arteries is due to high blood pressure, diabetes, smoking. She’s got two of those three.
“So — and, again, it’s — the high blood pressure and the smoking are long term lifestyle events. Now, I’ll turn that around a little bit so that we don’t have to go any further on the blood pressure issue. If all of a sudden for no reason at all her blood pressure went totally out of control and she had a massive hemorrhage, a blood vessel blew open in her brain like the radiator hose does on your car on a hot day and we saw a huge clot in her head, then I would say, yeah, that looks like that’s due to high blood pressure. That’s a completely different kind of stroke. That is not at all what this woman had.”
When asked about whether Nelson’s earlier injury and her continued pain while working could have aggravated her blood pressure to a dangerous level, precipitating a blood clot and resulting stroke, as Nelson had alleged in her complaint, Dr. Dmytrenko testified as follows:
“The wive’s tale or the common saw that stress leads to strokes is exactly that. That, in fact, the concept of the type A personality having heart attacks or having strokes does not occur because of specific individual point events. That these are things that occur over years and years and years of uncontrolled high blood pressure, uncontrolled cholesterol, uncontrolled smoking, but that in my opinion to say that somebody lifted a box, developed some chest pain, didn’t feel good, the blood pressure went up, and that all led to a stroke is stretching anything believable.”
The trial court’s lengthy judgment rejects Dr. Dmytrenko’s opinion because both Nelson and Jackson denied Nelson’s having had any symptoms of a stroke on August 24; both women denied reporting that fact to Dr. Dmytrenko. Based on that discrepancy, the trial court concluded that Dr. Dmytrenko’s medical opinion that Nelson’s stroke was not related to her job was unreliable because he did not have a full history or a history reported by Nelson or another proper source.
The procedural history of this case is long and complicated. In fact, this is the second time this case has been before this court. See Nelson v. Dollar Gen. Corp., 900 So.2d 1248 (Ala.Civ.App.2004). Nelson sued Dollar General, seeking workers’ compensation benefits for her stroke on October 13, 2001. The trial court entered a summary judgment in favor of Dollar General in November 2008; we reversed that judgment for its failure to comply with Ala.Code 1975, § 25-5-88, in 2004. Nelson, 900 So.2d at 1249. After the reversal, Nelson, among other things, amended her complaint to include a claim regarding her wages under the federal Fair Labor Standards Act, 29 U.S.C. § 201, et seq.; the entire case was then removed to federal court, and the workers’ compensation claim was later remanded to the trial court. In October 2005, the trial court entered a summary judgment in favor of Dollar General; after considering Nelson’s postjudgment motion, the trial court set the summary judgment aside, and the case was set for trial. After some delay caused by continuances and the re *119 tirement of the original trial judge, the case was ultimately tried in January 2008. The trial court entered a judgment finding in favor of Nelson, finding her to be permanently and totally disabled, finding her average weekly wage to be $425, and awarding benefits accordingly. After its postjudgment motion was denied, Dollar General appealed.
On appeal, Dollar General argues that the trial court erred in concluding that Nelson proved both legal and medical causation of her stroke. It further argues that the trial court erred in computing Nelson’s average weekly wage. Because we agree that Nelson failed to prove legal causation, we pretermit discussion of Dollar General’s other issues. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (stating that this court would pretermit discussion of further issues in light of the dispositive nature of another issue).
Our review of this case is governed by the Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq., which states in pertinent part: “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala. Code 1975, § 25-5-81 (e)(2). Therefore, this court “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, a trial court’s finding of fact is supported by substantial evidence if it is “supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing Ala. Code 1975, § 12 — 21—12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(1); see also Ex parte Trinity Indus., 680 So.2d at 268.
Because Nelson did not suffer an “accident” as that term is used in workers’ compensation law, see Ala.Code 1975, § 25-5-1(7) (defining the word “accident” as “an unexpected or unforeseen event, happening suddenly or violently”); Ex parte Trinity Indus., 680 So.2d at 266 & 266 n. 3 (explaining that an accident is “a sudden and traumatic external event”), Nelson’s stroke is considered a “nonacci-dental” injury, caused by the combination and culmination of physical activity and conditions. To succeed in her action for benefits, Nelson must prove both medical and legal causation. The purpose of the distinction between “accidental” and “non-accidental” injuries created by our supreme court in Ex parte Trinity Industries is to require an injured employee to present evidence to enable “ ‘ “the rational mind ... to trace the resultant injury to a proximate cause set in motion by the employment and not otherwise. Id. at 268 (quoting Slimfold Mfg. Co. v. Martin, 417 So.2d 199, 202 (Ala.Civ.App.1981), quoting in turn Wooten v. Roden, 260 Ala. 606, 610, 71 So.2d 802, 805 (1954)). Our supreme court has made it very clear that the purpose of the legal-causation standard is “to prevent employers from being unfairly saddled with the cost of being made an absolute insurer of an employee’s health.” Id. at 267. The accidental/nonac-cidental distinction requires an injured employee who is injured in a manner unlike being struck by a hammer or falling off a ladder to prove more than just that the incident occurred and resulted in an injury. Id. at 266. To establish legal causation, an injured employee suffering from a *120 nonaccidental injury must prove that he or she was exposed to a “ ‘danger or risk materially in excess’ of that danger to which all persons are ordinarily exposed in their everyday lives.” Id. at 269 (quoting City of Tuscaloosa v. Howard, 55 Ala.App. 701, 705, 318 So.2d 729, 732 (Civ.1975)).
The facts that Nelson argues would tend to prove whether, in fact, she was exposed to a risk materially in excess of the typical risks to which all persons are ordinarily exposed in daily life include Nelson’s long hours, the stress of her job, the pain of her earlier injury, and the stress she experienced on the date of the stroke. As explained above, Nelson presented evidence indicating that she worked long hours, between 70 and 80 per week, as the manager of the store. She described her job as stressful, and Dr. Barnes’s notes and testimony revealed that she had mentioned the stressful nature of her job to him. However, Dr. Barnes also noted that Nelson had other stress-causing issues in her life, including problems with family members, problems with relationships, and her own health issues, including her high blood pressure and menopausal concerns. He testified that Nelson was “in an age range where hormones, blood pressure, and anxiety can interplay to create depressive symptoms,” which he said he treated by prescribing medications to regulate her blood pressure and her anxiety or depression symptoms.
On the day of Nelson’s stroke, Nelson arrived at work quite early to prepare the stockroom for incoming merchandise she expected to arrive via a specially arranged truck delivery at around 6:00 or 6:30 a.m. Nelson testified that she had not done any heavy lifting that morning. Nelson was informed at some point that morning that the truck would not be arriving as scheduled. This event, Nelson said, “was just pure stress”; she described her feelings about the event as “I went my limit.” After this stressful event, Nelson suffered her stroke.
This case is not unlike Safeco Insurance Cos. v. Blackmon, 851 So.2d 532, 538 (Ala.Civ.App.2002), in which this court reversed a trial court’s judgment determining that an employee’s working in a stressful job 70-75 hours a week for a two- to three-month period before being diagnosed with a heart condition had proven legal causation of his heart condition.[1] The employee in Blackmon had also suffered other stressful events in and around the same time, including a divorce, the death of a family member, and sending his child to college. Blackmon, 851 So.2d at 538. In reversing the trial court’s judgment, we stated that, “[i]n their everyday lives, people often are exposed to temporary periods of significant stress.” Id. We reversed the trial court’s judgment because there was not enough evidence from which the trial court could have concluded that the employee’s stress “was more severe than what people generally are exposed to at some time or another in their everyday lives.” Id.
The stress that Nelson described suffering cannot be said to have been a “ ‘risk materially in excess’ of that danger to which all persons are ordinarily exposed in their everyday lives.” Ex parte Trinity Indus., 680 So.2d at 269. Nelson testified that she had loved her job as a manager, and she said that she worked hard because *121 she, like her boss, wanted everything perfect in the store. Even she admitted that every employee suffers some level of stress over his or her employment because the employee needs the job and should want to do a good job. Everyone has had to deal with changes in schedules and with situations that go awry, both in employment and in everyday life. Working extended hours and dealing with pain after an injury are also typical situations that people must endure in both their employment and in their everyday lives. We cannot agree that Nelson presented substantial evidence indicating that she was exposed to a “ ‘danger or risk materially in excess’ of that danger to which all persons are ordinarily exposed in their everyday lives.” Id.
Because Nelson failed to present evidence sufficient to prove that she was exposed to a “ ‘danger or risk materially in excess’ of that danger to which all persons are ordinarily exposed in their everyday lives,” id., she failed to prove legal causation of her stroke. We therefore reverse the trial court’s judgment awarding Nelson workers’ compensation benefits. Because our conclusion that Nelson failed to prove legal causation is dispositive, we pretermit discussion of Dollar General’s other arguments on appeal. See Waldrop, 924 So.2d at 723.
REVERSED.
PITTMAN and BRYAN, JJ., concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.

. Although the employee in Blackmon was required to prove legal causation by clear and convincing evidence, see Blackmon, 851 So.2d at 537 (explaining that the employee, because he was arguing that his condition had developed gradually over time, was required to prove legal causation by clear and convincing evidence), as opposed to merely by a preponderance of the evidence, we find the rationale of the opinion instructive.